```
                  UNITED STATES DISTRICT COURT

                  EASTERN DISTRICT OF LOUISIANA


                                              CIVIL ACTION

IN RE: THE BABCOCK & WILCOX                   NO: 08-3608
COMPANY
                                              SECTION: R
```

### MEMORANDUM OPINION

Before the Court are cross-appeals from the March 31 order entered by the United States Bankruptcy Court, Eastern District of Louisiana, in the matter of *In re: Babcock & Wilcox Co.* (SR-00001.)[1]  For the following reasons, the Court REVERSES the March 31 decision of the bankruptcy court.

I.  **Background**

The facts underlying this appeal are largely undisputed.

---

[1] References designated "SR" are to the Supplemental Record on Appeal jointly submitted by the parties.  (*See* R. Docs. 7, 13, 15.)

Debtor in bankruptcy Babcock & Wilcox Co. ("B&W") was a designer and manufacturer of pressure boilers, some of which contained asbestos. At some point, B&W and its parent company purchased insurance to cover B&W's potential liability for asbestos-related personal injury claims. One of B&W's insurers, First State Insurance Co., issued three excess insurance policies to B&W.

As B&W faced an increasing number of asbestos-related claims in the 1990s, a coverage dispute developed between it and First State, eventually culminating in a lawsuit in Ohio state court. In 1999, B&W and First State settled their dispute and entered into an agreement obligating First State to pay B&W a total of $7 million, spread over a number of years ("Pre-Petition Agreement").

On February 22, 2000, B&W filed a petition in the United States Bankruptcy Court, Eastern District of Louisiana, pursuant to Chapter 11 of the United States Bankruptcy Code. After the filing of the petition, First State began to make its scheduled payments into escrow rather than directly to B&W. Another dispute ensued, and the parties eventually entered into an Amended Settlement Agreement ("Amended Agreement"), which is the subject of the present controversy. The bankruptcy court approved the Amended Agreement on June 16, 2004. Under the Amended Agreement, First State agreed to transfer the money in escrow and another lump-sum amount, totaling $5.5 million, to the

B&W Asbestos Personal Injury Trust ("Trust"), which the parties anticipated would be created under the then-pending Third Amended Joint Plan of Reorganization ("Plan").[2]  The Trust would then use the First State funds and other funds owed to B&W to process and pay out claims submitted by present and future asbestos claimants.  (*See* SR-00585-86.)  First State was not obliged to transfer the money until the Plan went into effect.  (See SR-00100.)

On January 17, 2006, this Court entered an order confirming the Plan.  (*See* SR-00129.)  The Plan and its associated agreements created three entities: (1) the Trust, (2) the B&W Asbestos Personal Injury Trust Advisory Committee ("TAC"), which was charged with representing the interests of existing asbestos claimants, and (3) the Legal Representative of Future Asbestos-Related Claimants ("FCR"), who was charged with representing the interests of future asbestos claimants.  (*See* SR-00609.)  An exhibit to the Plan established a set of procedures for the Trust to follow in disbursing funds to asbestos claimants.  (*See* SR-

---

[2] The Amended Agreement specifically refers to the "Third Amended Joint Plan of Reorganization as of June 25, 2003, as modified as of December 30, 2003 . . . as such plan may be modified from time to time in accordance with the terms thereof, provided, however, that such modifications do not materially and adversely affect the interests of any Party under this Amended Agreement."  (SR-00099-100.)  All parties agree that the reorganization plan that was eventually approved by the bankruptcy court and by this Court (*see* SR-00549) meets this description.

00654.)  On March 22 and 24, 2006, First State transferred to the Trust the total amount due under the Amended Agreement.  (*See* SR-00337.)

The present dispute arises out of one of the collateral provisions in the Amended Agreement.  Among other things, the Agreement granted First State:

> the right (upon reasonable notice, at its own expense, and in a manner convenient to the Babcock Parties and/or the Asbestos PI Trust as applicable) to review relevant files, information, and documents concerning Claims subject to payment or potential payment with the proceeds of this Amended Agreement.

(SR-00108.)

On March 6, 2007, First State sent a letter to the Trust seeking to exercise its right of review.  (*See* SR-00319.)  In response, the Trust expressed concern about the disclosure of certain confidential claimant information.  The Trust proposed a confidentiality agreement, which would have forbade First State from disclosing the claims materials to third parties and would have obliged First State to "implement adequate internal policies and procedures" to safeguard the information.  (*See* SR-00328-29.)  First State responded that the Amended Agreement did not limit its right to use the claims materials in any way and indicated that it would not sign the confidentiality agreement.

On December 26, 2007, First State filed a Motion to Enforce Settlement Agreement with the bankruptcy, repeating its contention that the right of review included a right to use the

-4-

information as it saw fit, subject to the provisions of the Amended Agreement and applicable privacy laws.  The Trust and TAC opposed First State's motion, arguing that a right of review is necessarily limited by confidentiality principles.  In addition, the Trust and TAC argued that First State's right of review is limited to claims actually or potentially paid from the proceeds of the Amended Agreement, that is, limited to claims paid from the $5.5 million that First State contributed.

On March 31, 2008, the bankruptcy court entered an order relating to First State's right of review.  First, with respect to the nature of the right, it ordered that "First State shall have unfettered use, and may maintain copies, of the Subject Claim Materials, subject to any law that protects confidentiality or otherwise restricts use of the files, documents, or information."  (SR-00003.)  In addition, it ordered the Trust to compile a list of claimants who had been paid by the Trust, arrange the list in a random order, and "identify to First State each claimant on that list, in order, until the total value of the amounts paid by the Trust to those claimants equals $5.5 million."  (SR-00002.)  For those claimants, whom the court designated Subject Claimants, the Trust was ordered to produce the claims files and other information.  First State was forbidden from accessing any other claims material held by the trust absent an agreement between the parties.  (SR-00003.)

The parties have now appealed the bankruptcy court's order to this Court. The Trust, TAC, and FCR ("Trust Parties") challenge the provision granting First State "unfettered use" of the claims material. First State challenges the provisions limiting its right of review to particular claimants.

## II.  Legal Standards

### A.   Standard of Review

A district court reviews appeals from bankruptcy court rulings in the same manner that a court of appeals would review an appeal from a civil proceeding in a district court. *See* 28 U.S.C. § 158(c)(2). Accordingly, the bankruptcy court's conclusions of law are reviewed *de novo*, its findings of fact are reviewed for clear error, and its resolutions of mixed questions of law and fact are reviewed *de novo*. *See In re Nat'l Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000).

### B.   Contract Interpretation

Both parties agree that the Amended Agreement is governed by Louisiana law. In Louisiana, settlement agreements are interpreted according to the same general rules of construction applicable to contracts. *Smith v. Walker*, 708 So.2d 797, 802 (La. Ct. App. 1998). The interpretation of a contract is the "determination of the common intent of the parties with courts

-6-

giving the contractual words their generally prevailing meaning unless the words have acquired a technical meaning." *E.R. Campbell v. Melton*, 817 So.2d 69, 74 (La. 2002); *see also* LA. CIV. CODE arts. 2045-2057. Accordingly, if the words of a contract are clear and explicit and do not lead to absurd consequences, then no further interpretation may be made in search of the intent of the parties. *Campbell*, 817 So.2d at 75.

**III. Discussion**

    **A.    Nature of Right of Review**

The first dispute between the parties concerns the nature of First State's right of review in the Amended Agreement. The Trust Parties read the word review narrowly to mean "view." Apparently envisioning that First State employees will be permitted only to look at the claims materials, they ask the Court to "order that First State shall not copy, obtain, or disseminate" the files. (R. Doc. 10 at 32.) First State, on the other hand, argues that the right to review necessarily includes a concomitant right to "meaningfully discuss the results of that review." (R. Doc. 21 at 12.) As such, it asks the Court to affirm "the Bankruptcy Court's ruling that First State's Review Rights encompass not only the right to inspect, analyze and copy Claims Materials, but appropriately to share, use and disclose them as well." (*Id.* at 28.)

In approaching this matter, the Court must first ask whether the term "review" is ambiguous.  All parties agree it is unambiguous.  The interpretation of the provision is therefore a question of law, *see Sequoia Venture No. 2, Ltd. v. Cassidy*, 968 So.2d 806, 809 (La. App. 2007), and the Court will review the bankruptcy court's order *de novo*.  Moreover, the Court will not consider extrinsic evidence.  *See Taylor v. Manuel*, 799 So.2d 812, 815 (La. App. 2001).

Turning to the Trust Parties' proposed interpretation, the Court finds that it is unsupported by the language of the Amended Agreement.  As First State emphasizes, and the Trust Parties themselves seem to recognize, "review" connotes a more thorough process than "view."  The dictionary cited by the Trust Parties defines "review" as "'[t]o study or examine again,' '[t]o examine with an eye to correction or criticism,' or '[t]o peruse material."  (R. Doc. 10 at 19 (citing MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1003 (10th ed. 1997)).)  These definitions imply that a review entails both an initial viewing and a subsequent analysis or "study."  Moreover, as First State points out, the Amended Agreement expressly contemplates that the right of review will produce "results."  (SR-00109.)  A right to look at files without a right to copy or analyze the information contained therein is unlikely to produce results.  A right to review the claims materials must therefore be something more than the right to look

at them.

On the other hand, nothing in the word "review" suggests a right to "unfettered use," as the bankruptcy court ruled, or an unlimited right to share, as First State urges. All of the definitions cited by the parties focus on the intake of information rather than the output of information. For example, Black's Law Dictionary defines review to mean "consideration, inspection, or reexamination of a subject or thing." BLACK'S LAW DICTIONARY 1345-46 (8th ed. 2004). Even the more expansive definitions cited by First State refer to information output as a reason for conducting a review, not as an essential component of a review. (*See, e.g.*, CAMBRIDGE DICTIONARY OF AMERICAN ENGLISH 733 (2001) (defining "review" to mean "to consider (something) in order to make changes in it, study it, or give an opinion about it").) None of the sources cited by the parties suggests that dissemination is an inherent component of the concept of "reviewing."

First State itself argues that the term "review" "indicates a thorough study of materials, with an eye towards producing conclusions substantiated by facts drawn from that review." (R. Doc. 21 at 13.) To get from "thorough[ly] study" to "disseminate," First State argues that "the default understanding for claim-related information received by liability insurers . . . is that confidentiality concerns generally do not

-9-

attach, and the claim-related information they receive and review may be disclosed." (*Id.* at 14.)

The relationship between First State and the Trust is not a typical liability insurance arrangement, however. In the Amended Agreement, First State expressly gave up any right to obtain or use claims information that it may have had under the original insurance policies. (*See* SR-00106.) In place of those rights, First State reserved only the right "to review relevant files, information and documents concerning Claims subject to payment with the proceeds of this Amended Agreement." (SR-00108.) As discussed, this right of review is limited to inspection and analysis. When First State notes that the Trust Parties "presuppose[] the confidentiality of all information held by the Trust," then, it is not too far from the mark. The Trust retained all rights to the information in its possession, with the exception that it granted First State the right to review certain claims files. Absent further agreement among the parties, First State may not use its right of review as a bootstrap to obtain other rights not reasonably comprehended within the right of review or otherwise granted to First State in the Amended Agreement.

Two other federal courts have interpreted materially similar contract language in this way. In *In re Fuller-Austin Insulation Co.*, Civ. No. 02-1661-JJF, Order (D. Del. May 16, 2008), First

-10-

State had entered into a settlement agreement that granted it the right "to review relevant files, information and documents concerning Asbestos-Related Claims subject to payment or potential payment with the proceeds of this Agreement." (*Fuller-Austin* Agreement, R. Doc. 10-5 at 21.) Upon First State's motion to enforce the settlement agreement, the district court ordered that First State "shall not disclose, release, share or disseminate those produced materials . . . ."[3] (*Fuller-Austin* Order, R. Doc. 10-4 at 2.) Similarly, in *In re Western Asbestos Co.*, No. 02-46284 T, 2008 WL 1734577 (Bankr. N.D. Cal. April 11, 2008), the bankruptcy court interpreted a right "to review and/or audit the Trust and Trust payments" to "prohibit the use the information obtained through the audit for [the insurance company's] own purposes or to disclose that information to third parties." *Western Asbestos*, 2008 WL 1734577 at *9. First State argues that these cases are distinguishable from the present case because the contracts were governed by California law rather than Louisiana law. The two cases are indeed distinguishable in certain respects.[4] Nevertheless, the clear trend among federal

---

[3] The court also ordered First State to return the claims materials and destroy any copies after three months. (*See* R. Doc. 10-4 at 3.) None of the parties has urged this Court to adopt that interpretation, and the Court declines to do so.

[4] For example, the *Western Asbestos* case concerns a somewhat differently worded provision, and the court considered extrinsic evidence.

courts faced with this issue is to construe the right of review to prohibit further dissemination of the claims information.

For these reasons, the Court finds that the Amended Agreement grants First State the right to view and analyze the specified claims materials, but not to disseminate the materials or the information contained therein to third parties.[5]  The Court also finds that, under the present circumstances, First State's right to analyze the claims materials necessarily includes the right to make copies of the materials and extract information from them, and to manipulate the extracted information and share it within First State's corporate organization.  Just as a natural person's right to review certain information would reasonably be understood to include the right to commit the information to memory and to think about it, a corporate entity's right of review is reasonably understood to include the right commit the information to its organizational "memory" by retaining copies and to "think" about the information by internally sharing and discussing it.  Without these concomitant rights, First State's ability to produce the results contemplated by the Amended Agreement would be greatly hindered.

First State also argues that it needs to be able to share the claims materials so that it can alert courts and other trusts

---

[5] Of course, First State is not impaired in its ability to "suggest changes to the Trust, or to inform the Court of potentially improper practices."  (R. Doc. 21 at 18.)

to potentially fraudulent claims.  If First State's internal review uncovers fraudulent practices, it should inform the bankruptcy court of its findings and seek modification of the court's order to the extent necessary to protect its rights. *(Cf. Fuller-Austin* oral arg. transcr., R. Doc. 10-6 at 26 ("THE COURT: Why can't you say, Judge, let us look [at the claims files], we'll agree not to release anything until we know exactly what it is that we want to take out, if anything?"); *Fuller-Austin* Order, R. Doc. 10-4 at 3 (providing that the parties may by motion seek modification of the court's order).)

### B.   Claims Materials Subject to Review

The second dispute concerns the types of claims that fall within First State's right of review.  Focusing on the phrase "payment or potential payment with the proceeds of this Amended Agreement," the Trust Parties read First State's right to be limited to "claims that the Trust paid or potentially paid from the $5.5 million that First State paid the Trust."  (R. Doc. 19 at 1.)  Under this interpretation, the Trust theoretically pays each claim using funds from one particular insurer.  By the clear language of the Amended Agreement, the Trust Parties argue, First State is entitled only to review the claims that were paid or will be paid using First State funds.  Conceding that there is no practical way to track which of the commingled funds were used to

pay which claims, the Trust Parties argue that the bankruptcy court's system for randomly selecting $5.5 million worth of paid claims is a reasonable method of implementing the language of the Amended Agreement.

As First State notes, however, this interpretation reads out an important part of the review clause.  The claims that First State may review are those "*subject to* payment or potential payment with the proceeds of this Amended Agreement" (SR-00108 (emphasis added)), not just those that have actually been paid or will actually be paid using the First State funds.  The phrase "subject to payment or potential payment" covers all claims that First State funds could, under the terms of the Amended Agreement, be used to pay.  *Cf. Klein v. Rush-Presbyterian-St. Luke's Medical Center*, 990 F.2d 279, 286 (7th Cir. 1993) ("'Subject to reduction' [referring to an employee's salary] does not mean that a reduction was actually made.  The plain meaning of the language suggests that it is enough that a deduction could have been made . . . .").  In other words, the right of review covers all claims that are amenable to payment from the First State funds.  Because the parties have not directed the Court's attention to any provision of the Amended Agreement limiting the types of claims to which the First State funds may be applied, the Court finds that First State's right of review must therefore cover every asbestos-related claim submitted to the Trust.

To the extent that the Trust Parties acknowledge the "subject to" wording at all,[6] they suggest that it means "contingent upon" rather than "liable to."  For example, they cite a case interpreting a Washington state statute to argue that "the Subject To Clause necessarily limits the claims that First State may review."  (R. Doc. 19 at 5.)  But the Washington statute at issue used "subject to" in a different sense than the Amended Agreement.  The statute provided that certain public officials shall continue to hold their office, "subject to reappointment by the governor and confirmation by the senate." *Luther v. Ray*, 588 P.2d 1188, 1190 (Wash. 1979).  In that context, "subject to" means "contingent upon"; that is, the public officials' continuance in office was contingent upon their being reappointed and confirmed.  The phrase "Claims subject to payment or potential payment," by contrast, describes claims that are liable to payment.

The Trust Parties also argue that First State's interpretation renders the second half of the clause superfluous.  If all claims submitted to the Trust are "subject to payment or potential payment" from the First State funds, they argue, the Amended Agreement could just have granted First State the right

---

[6] Tellingly, the Trust Parties several times quoted the clause in their briefs and at oral argument as "paid or potentially paid" rather than "subject to payment or potential payment."  (*See, e.g.*, R. Doc. 19 at 1, 10.)

-15-

to "review relevant files, information and documents concerning Claims . . . ." Such a right would have been far broader than the one granted under First State's interpretation, however. The Amended Agreement defines "claim" to mean, *inter alia*:

> any claim, whether past, present or future, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, or direct or indirect, and whether in law, equity, admiralty or otherwise . . . .

(SR-00097.) Removing the "subject to" language would have had the effect of extending First State's right of review beyond asbestos claims to any legal action instituted against the Trust. Indeed, there would no longer have been any provision limiting the right of review to claims against the Trust at all. If First State had the right to review all files "concerning Claims," it could demand access to any file concerning any claim against any organization that happened to be in the Trust's possession. The "subject to" language is not superfluous.

The Trust Parties' strongest argument appeals to common sense. As the bankruptcy court phrased it, First State's interpretation seems to "call[] on a $[5.5] million tail to wag a $289 million dog." (SR-00014; *see also* R. Doc. 19 at 2 ("[T]he Bankruptcy Court properly read the Subject To Clause to create a symmetry between the amount First State paid ($5.5 million) and the scope of First State's review rights (claims paid a total of $5.5 million).") There is an admittedly counterintuitive quality to the notion that an insurance company may gain access to

-16-

information on many more claims than its small contribution could ever possibly cover. But the task of the Court is to enforce the Amended Agreement as written. As discussed, the Amended Agreement grants First State access to files related to claims "subject to payment or potential payment" with the First State funds, which essentially means all of the asbestos claims received by the Trust. The parties to the Amended Agreement could have negotiated a broader or narrower right of review, but there is no necessary reason why the right must be limited to $100 worth of claims, $5.5 million worth of claims, or any other amount.

The Court also notes that the district court in *Fuller-Austin* adopted this same interpretation of materially similar language. In that case, the court ordered the trust to produce "all claimant submissions to the Trust," notwithstanding an identical provision limiting the right of review to "Claims subject to payment or potential payment with the proceeds of this Agreement." (*Fuller-Austin* Order, R. Doc. 10-4 at 1.)

For the foregoing reasons, the Court finds that First State's right of review is not limited to $5.5 million worth of paid claims. The Amended Agreement grants First State the right to review all asbestos-related claims submitted to the Trust,

whether paid or not.[7]


## IV. Conclusion

For the foregoing reasons, the March 31 order decision of the bankruptcy court is REVERSED.


New Orleans, Louisiana, this 31st day of October, 2008.

*Sarah Vance*
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[7] At oral argument, the FCR suggested that this interpretation would grant First State the perpetual right to review all claims submitted to the Trust and that First State could exercise its right as often as it liked until the Trust had exhausted the more than $1 billion constituting the *res*. It does not necessarily follow from the Amended Agreement that First State may exercise its right of review more than once. Indeed, some of the language suggests that the right may be invoked only once. (*See, e.g.*, SR-00109 (referring to "a review") (emphasis added).) This issue is not before the Court, however, and the Court declines to resolve it.